UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Office of Consumer Counsel and       :
New England Cable and                :
Telecommunications Association, Inc., :
     Plaintiffs,                     : **LEAD**
                                     : **Case No. 3:06cv1106**
**v.**                                   :           **(JBA)**
                                     :
Southern New England Telephone       :
Company d/b/a AT&T Connecticut, Inc.  :
and Department of Public Utility Control:
of the State of Connecticut,         :
     Defendants.                     :

### RULING ON MOTIONS TO DISMISS [DOCS. ## 37, 39, 42, 45]

This declaratory and injunctive relief action originated as
two separate lawsuits.  The first was brought by the Office of
Consumer Counsel ("OCC"), an independent office within the
Connecticut Department of Public Utility Control charged to act
as an advocate for consumer interests in matters that may affect
ratepayers with respect to public service companies, and the New
England Cable and Telecommunications Association, Inc. ("NECTA"),
a nonprofit corporation and trade association that represents the
interests of most cable operators holding franchises in
Connecticut, against Southern New England Telephone Company,
doing business as AT&T Connecticut, Inc. ("AT&T") and the
Department of Public Utility Control of the State of Connecticut
(the "DPUC") (Case No. 06cv1106).  The second action was brought

by Cablevision of Connecticut, L.P., Cablevision of Southern Connecticut, L.P., and Cablevision of Litchfield, Inc. (collectively, "Cablevision") against the DPUC (Case No. 06cv1107). Both cases focus on the issue of whether a proposed new service offered by AT&T falls within the definition of "cable service" under the Cable Communications Policy Act of 1984 ("Cable Act"), as amended, 47 U.S.C. § 521 et seq.,[1] thus subjecting AT&T to cable regulation in Connecticut, and challenging the DPUC's determination that AT&T's new service did not fall within the federal "cable service" definition. See OCC/NECTA Compl., Case No. 06cv1106 [Doc. # 1]; Cablevision Compl., Case No. 06cv1107 [Doc. # 1]. Jurisdiction is claimed under 28 U.S.C. § 1331, on the basis that the action arises under federal law, specifically, the Supremacy Clause, the First Amendment, and the Fourteenth Amendment of the United States Constitution, and various provisions of the federal Cable Act. Currently pending before the Court are the Motions to Dismiss by defendants DPUC and AT&T, primarily for lack of standing and ripeness [Docs. ## 37, 39, 42, 45]. For the reasons that follow, the Motions to Dismiss will be granted in part and denied in part.

---

[1] The Cable Act was enacted "to amend the [federal] Communications Act of 1934 to provide a national policy regarding cable television." See H.R. Rep. No. 98-934 at 18, reprinted in 1984 U.S.C.C.A.N. 4655. The Cable Act is codified as Title VI of the Communications Act.

## I.   Factual Background

The plaintiffs' Complaints allege that AT&T (formerly SBC, and before that, SNET), "is planning to enter the cable television service business in Connecticut, but would like to do so without being subject to the many regulatory burdens that apply to existing cable companies such as Cablevision [and NECTA's members]."  Cablevision Compl. ¶ 1. "Advances in technology have changed the way in which current cable television operators, such as [plaintiffs], provide video programming service to subscribers.  What once may have been fairly passive, one-way networks used to deliver signals to residential subscribers are now advanced, two-way networks that involve complex internal system interactions to monitor and manage the provision of service.  Changes in law and technology are also leading existing telephone companies, like Defendant AT&T, to seek to use their networks and lines to offer residents packages of video programming channels like and in competition with those offered by current cable operators."  OCC/NECTA Compl. ¶ 1. Plaintiffs claim that "AT&T's proposed service will be nearly identical to today's cable service from a subscriber perspective, with the same television channels (ABC, CNN, ESPN, etc.), the same sort of on-screen program guide, and the same video-on-demand and similar features available from cable operators today. Like [plaintiffs], AT&T will transmit video programming one-way,

from its network to subscribers. Nonetheless, AT&T claims that its proposed television service is somehow not a 'cable service' because of a certain technology difference, invisible to subscribers, between the technology AT&T will use in connection with the transmission of channels to subscribers (called 'switched' video transmission) and the technology that existing cable companies have generally used in connection with this transmission (which AT&T calls 'broadcast' video transmission)." Cablevision Compl. ¶ 1.

The DPUC, "hearing of AT&T's plans, opened a proceeding to consider whether AT&T's proposed new service fits the Federal definition of 'cable service,' and therefore should be subject to cable regulation in Connecticut. The DPUC accepted AT&T's argument and, based on its interpretation of Federal law, ruled in AT&T's favor." Id. ¶ 2. As "AT&T has publicly stated that it will begin offering its Video Service in Connecticut without any cable regulation in the near future," OCC/NECTA Compl. ¶ 3 (also alleging that AT&T stated it might be "as early as the fourth quarter of 2006), plaintiffs "ask the Court to clarify and declare the proper federal law classification of the services and networks currently being deployed and used by existing cable operators, and new video programming entrants, like AT&T. In light of [d]efendant AT&T's proposed video programming service and changes in the marketplace, [p]laintiffs seek a declaration

that the provision of video programming that includes programming that is prescheduled by the video programming provider is not and cannot be 'interactive on-demand service' under federal law. Plaintiffs seek a declaratory judgment that the video programming service and associated network to be provided by [d]efendant AT&T constitutes a 'cable service' provided over a 'cable system' by a 'cable operator' under federal law." Id. ¶ 2. Plaintiffs contend that "[b]y relieving AT&T of cable regulatory requirements, [the DPUC] has undermined the Federal regulatory framework for cable television established by Congress, provided AT&T an unfair competitive advantage over existing cable companies, and left Connecticut's consumers without any of the Federal framework's protections." Cablevision Compl. ¶ 4. According to plaintiffs' Supplemental Submission [Doc. # 75], filed after briefing on defendants' Motions to Dismiss concluded, AT&T announced on December 27, 2006 that it was beginning to offer its "U-verse" video programming service in areas in Connecticut; according to AT&T statements and press reports, as of January 2007 the service was available in neighborhoods in at least nine towns and cities across the state. See Suppl. Sub. at 2 & n.2.

Accordingly, the OCC/NECTA Complaint advances the following claims: Count 1 seeks a judicial determination that the DPUC's decision is invalid as preempted by the Cable Act, that AT&T's

proposed video service does constitute a "cable service" being offered over a "cable system" by a "cable operator," and that AT&T must therefore obtain a cable franchise prior to providing its service in Connecticut, see OCC/NECTA Compl. ¶¶ 38-56; Count 2 seeks a declaration that because the DPUC's decision is preempted, AT&T must comply with the Cable Act and related FCC regulations, see id. ¶¶ 57-77; Count 3 claims that the DPUC's decision is discriminatory in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution, see id. ¶¶ 78-82; and Count 4 seeks an alternative declaration that, in the event that the Court holds that AT&T's service does not constitute a "cable service," similar video programming being provided by members of NECTA also do not constitute "cable service[s]" falling under the ambit of the Cable Act and related regulations, see id. ¶¶ 83-89. Cablevision asserts similar claims: Count 1 seeks a declaration that "[t]he DPUC's determination that AT&T's planned video offering is a not a cable service and that AT&T is thereby exempt from Federal franchising requirements applicable to Cablevision expressly authorizes AT&T to compete against Cablevision in a manner that violates and is preempted by Federal law [and] [u]nder the Supremacy Clause of the United States Constitution, the Decision is preempted and superceded," see Cablevision Compl. ¶¶ 37-39; Count 2 seeks a determination that "Title VI of the

Federal Communications Act establishes four methods for telephone companies lawfully to offer video programming services [and] [t]he DPUC's conclusion that AT&T may offer video programming services in a fifth manner not provided by Congress violates and is preempted by Federal law [and] [u]nder the Supremacy Clause of the United States Constitution, the Decision is preempted and superceded," see id. ¶¶ 40-41; Count 3 seeks a declaration that the DPUC's decision is discriminatory in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution, see id. ¶¶ 42-43; and Count 4 claims violation of civil rights pursuant to 42 U.S.C. § 1983, see id. ¶¶ 44-46.

The DPUC and AT&T now move to dismiss plaintiffs' claims on various grounds, as follows: (1) they challenge OCC's and Cablevision's standing to bring Counts 1-3 of each Complaint, respectively; (2) they challenge the ripeness of OCC/NECTA Complaint Counts 2-3 and Cablevision Count 3; (3) they challenge OCC/NECTA Count 4 as non-justiciable; (4) they challenge Cablevision Count 4 on Eleventh Amendment and failure-to-state-a-claim grounds; and (5) they seek to strike Cablevision's request for attorneys fees under 42 U.S.C. § 1988 as unauthorized under the Cable Act, 47 U.S.C. § 555a(a).

**II.  Counts 1 and 2**

Defendants challenge Counts 1 and 2 in both Complaints on standing grounds, and Count 2 of the OCC/NECTA Complaint on ripeness grounds.  Defendants' arguments will be rejected, as follows.

A.   Standing

The requirement that a plaintiff must have standing to bring a lawsuit is underpinned by the Article III case-or-controversy requirement, and is therefore jurisdictional.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180 (2000).  The party asserting standing has the burden of proof. See Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc., 448 F.3d 138, 145 (2d Cir. 2006).  "To satisfy the 'case' or 'controversy' requirement of Article III, which is the 'irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision."  Bennett v. Spear, 520 U.S. 154, 162-63 (1997).  In addition to these "immutable requirements of Article III, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing . . . [including] that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the

statutory provision or constitutional guarantee invoked in the suit." Id. (citing, inter alia Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150 (1970) ("Data Processing")).[2] "For purposes of determining standing, we must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Denney v. Deutsche Bank AG, 443 F.3d 253, 263 (2d Cir. 2006).

Defendants challenge NECTA's and Cablevision's standing to assert their respective Counts 1 and 2 here, claiming that they have failed to allege injury in fact and that they cannot satisfy the "zone of interests" test.

"An injury-in-fact must be 'distinct and palpable,' as opposed to 'abstract,' and the harm must be 'actual or imminent,' not 'conjectural or hypothetical.'" Id. at 264. Defendants contend that the injury alleged in plaintiffs' Complaints is prospective and speculative, insofar as they claim that they "will" suffer injury in the form of lost revenues, damages to

---

[2] As the Supreme Court in Bennett recognized, Data Processing "applied the zone-of-interests test to suits under the APA, but later cases have applied it also in suits not involving review of federal administrative action . . . and have specifically listed it among other prudential standing requirements of general application. . . . We have made clear, however, that the breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the generous review provisions of the APA may not to do so for other purposes." Bennett, 520 U.S. at 163.

reputation and good will, and that the DPUC's decision "will" result in an uneven playing field. Here, although plaintiffs do not allege that they have already suffered particularized economic injury, they allege a concrete injury in the form of unfair competition – they have alleged that they are being subjected to DPUC regulation pursuant to the Cable Act and concomitant state franchising and other regulations whereas their competitor, AT&T, is not subjected to the same regulation notwithstanding that it is also offering a "cable service" under the Act, resulting in an uneven playing field. Courts have recognized "that parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition." New England Public Commc'ns Council, Inc. v. Fed. Commc'ns Comm'n, 334 F.3d 69, 74 (D.C. Cir. 2003) (holding, in suit where Bell Operator Companies (BOCs) petitioned for review of FCC order requiring them to price intrastate service lines used by competing payphone service providers (PSPs) at forward-looking cost-based rates, and trade associations representing independent PSPs also petitioned, challenging the FCC's limiting its order to BOCs as opposed to non-BOC local exchange carriers (LECs), that "[t]he PSP petitioners also suffer immediate injury. The [FCC order], by departing from the [old regime of orders] under which the new services test applied to both BOCs and non-BOC LECs, leaves the

latter group free to set rates that discriminate against competitor PSPs. . . . While it is true, as the Commission points out, that the states may decide on their own to apply the new services test to non-BOC LECs, the PSP petitioners need not wait for the state to set the LECs' payphone line rates before bringing their challenge.  It suffices for the PSP petitioners to show that the [FCC order] has clear and immediate potential to hurt them competitively") (emphasis added); see also La. Energy & Power Auth. v. Fed. Energy Regulatory Comm'n, 141 F.3d 364, 366-67 (D.C. Cir. 1998) (holding, in suit where competitor of electricity provider brought petition for review of FERC orders approving provider's application to sell electricity at market-based rates, that "[petitioner] will be injured by increased price competition from [the competitor] regardless whether that pricing turns out to be predatory, as [petitioner] warns, or simply competitive as [the competitor] promises.  Such injury gives [petitioner] an actual and imminent, rather than conjectural or hypothetic, interest sufficient to establish injury in fact"); In re U.S. Catholic Conference, 885 F.2d 1020, 1028-29 (2d Cir. 1989) (observing "[t]he Supreme Court has found cognizable injuries to economic competitors. . . . Implicit in the reasoning of those opinions is a requirement that in order to establish an injury as a competitor a plaintiff must show that he personally competes in the same arena with the party to whom the

government has bestowed the assertedly illegal benefit," and dismissing plaintiffs' claim while acknowledging that "[i]n the inherently competitive political arena an advantage granted to one competitor automatically constitutes a hardship to the others," but finding that plaintiffs were "not players in that area or on that field"); Marshall & Ilsley Corp. v. Heimann, 652 F.2d 685, 692 (7th Cir. 1981) ("The Supreme Court has held . . . that an administrative agency's authorization of an allegedly illegal competitor or form of competition does constitute injury to competitors for standing purposes.").

Defendants also contend that plaintiffs, as cable operators, are not within the "zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Bennett, 520 U.S. at 162-63. Specifically, they contend that 47 U.S.C. § 541 (requiring a cable operator to obtain a franchise prior to providing cable service) and the other specific provisions of the Cable Act cited in the Complaints are intended to promote competition, protect the interests of new franchise applicants, and to safeguard cable service consumers/the public. However, applying the requirement as characterized in Bennett, plaintiffs and their interests are clearly "regulated by" these provisions of the Cable Act. Moreover, the Act more generally includes as one of its stated purposes to "promote competition in cable communications and

12

minimize unnecessary regulation that would impose an undue economic burden on cable systems." 47 U.S.C. § 521. By its very terms, therefore, cable operators and the nature of their competition are interests contemplated as within the scope of the Act. Further, equal application of the franchising requirements to AT&T, while also leveling the playing field for plaintiffs, far from being contrary to the interest of the cable consuming public, is consistent with protecting that interest. Cf. MCI Telecomms. Corp. v. Fed. Commc'ns Comm'n, 917 F.2d 30, 35-36 (D.C. Cir. 1990) (finding that competitors of dominant carrier AT&T who petitioned for review of the FCC's decision concerning AT&T's integrated service packages under the Cable Act fell within the zone of interests protected by the Cable Act, observing "[u]nder Clarke [v. Sec. Indus. Ass'n, 479 U.S. 388 (1987)], which relaxed the 'zone of interest' test, it is no longer necessary for petitioners to show that they are among the class that Congress affirmatively sought to benefit in enacting the statute. Still, we must deny standing if the interests petitioners seek to advance [are] only marginally related to the statutory concern or actually contrary to the statutory purpose," and concluding that "[s]ince this AT&T-only tariffing requirement is quite obviously designed in part to protect competitors, on the assumption that only such protection can ensure competition in this unusual market, it cannot be said that petitioners, as

competitors, are necessarily asserting interests contrary to consumers in challenging AT&T's tariffs").[3]

Thus, plaintiffs have alleged an injury in fact and their interests fall within the zone of interests protected or regulated by the Cable Act.  Moreover, the alleged injury is "fairly traceable" to the actions of the defendant DPUC, insofar as its decision has created the claimed unequal playing field and unfair competitive scenario, and a decision declaring the DPUC's determination unlawful and preempted, and ordering AT&T to comply with DPUC franchising requirements, would redress the alleged injury.  Thus, the elements of standing have been satisfied for these claims.

B.    Ripeness

As to AT&T's ripeness challenge to OCC/NECTA Count 2, which seeks an order requiring AT&T to comply with the Cable Act and related regulations applicable to other cable operators in Connecticut, AT&T contends that because it has not even begun to offer its video service anywhere in Connecticut, plaintiffs can only speculate about whether AT&T will be offering all of the

---

[3] Defendants' narrow reading of the zone of interests test, contending that because the specific provisions of the Cable Act which plaintiffs claim preempt the DPUC's decision do not appear to explicitly protect "incumbent cable television providers," is unpersuasive.  While these particular provisions may not be directed at protecting such cable providers, the overall scope of the Act encompasses promotion of fair competition between cable operators, which also is in the best interest of the consuming public.

required features referenced in Count 2 and whether it will comply with the relevant DPUC regulations.[4]

"To be justiciable, plaintiffs' claims must be ripe for federal review. . . . The ripeness doctrine protects the government from judicial interference until a . . . decision has been formalized and its effects felt in a concrete way by the challenging parties. . . . Moreover, an Article III court cannot entertain a claim which is based upon contingent future events that may not occur as anticipated, or indeed may nor occur at all. . . . Thus, when resolution of an issue turns on whether there are nebulous future events so contingent in nature that there is no certainty they will ever occur, the case is not ripe for adjudication." Thomas v. City of N.Y., 143 F.3d 31, 34 (2d Cir. 1998). "A dispute is ripe for adjudication when there is 'a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." Motor Vehicles Mfrs. Ass'n of the United States, Inc. v. N.Y. State Dep't of Envtl. Conservation, 79 F.3d 1298, 1305 (2d Cir. 1996) (citing Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)). The doctrine's "'basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract

---

[4] Plaintiffs' Supplemental Submission shows that AT&T is in fact now offering its video programming service in neighborhoods in at least nine towns and cities across the state.

disagreements.'" <u>Gary D. Peake Excavating Inc.</u>, 93 F.3d at 72

(citing <u>Abbott Labs. v. Gardner</u>, 387 U.S. 136, 148 (1967)).  "In

determining whether a claim is ripe for review, we consider the

fitness of the issues for review and the hardship to the parties

of withholding review." <u>Gary D. Peake Excavating Inc.</u>, 93 F.3d

at 72; <u>accord</u> <u>Motor Vehicles Mfrs. Ass'n</u>, 79 F.3d at 1305.

        Here, the issue is fit to be decided – the DPUC has issued

its decision that AT&T need not comply with its franchising and

other regulations promulgated pursuant to the Cable Act, and AT&T

has indicated that it will enter the market without obtaining a

franchise.[5]  Although the record does not reflect which specific

features AT&T is offering/will offer notwithstanding that it is

not required to do so by the DPUC, the damage of an allegedly

unequal/unfair playing field results from the DPUC's decision;

the Court need not wait for a more developed record as to what

specific features AT&T may or may not be offering in order to

determine the legal issue of whether the service AT&T is

providing should subject it to regulation pursuant to the Cable

Act.

        Moreover, NECTA members will suffer a hardship if the Court

withholds adjudication.  It is insufficient for AT&T to contend

that because it may voluntarily comply in some form or fashion,

_____

        [5] In fact, as of this date AT&T <u>is</u> offering its video
programming service in neighborhoods throughout Connecticut
without a franchise.  <u>See</u> Pl. Suppl. Sub. at 2.

16

whether fully or otherwise, with franchising and other
regulations applicable to cable operators providing cable
services because the nature of the harm alleged to have been
suffered by plaintiffs is an unequal playing field.  In view of
the DPUC's decision, AT&T has the option of voluntary compliance,
whether in whole or in part, but plaintiffs do not have the
choice.  Moreover, even if it were shown that AT&T was currently
in full compliance with the regulations applicable to plaintiffs,
in light of the DPUC's decision, AT&T is under no obligation to
continue such compliance into the future.  It is the impact of
the DPUC's determination that its regulations are inapplicable to
AT&T that causes plaintiffs' hardship, and that hardship is not
alleviated by the potential that AT&T may choose to voluntarily
provide some of the features which the regulations require of
plaintiffs.[6]

---

[6] That plaintiffs' harm may be more or less acute depending
on whether, and when, AT&T voluntarily seeks to comply with some
of the regulations applicable to plaintiffs does not undermine
the ripeness of Count 2 seeking a declaration that these
regulations are also applicable to AT&T, where the current state
of affairs (pursuant to the DPUC's decision) is that they are
not.  See Blum v. Yaretsky, 457 U.S. 991, 1000 (1982) ("[T]he
primary conception [is] that federal judicial power is to be
exercised only at the instance of one who is himself immediately
harmed, or immediately threatened with harm, by the challenged
action. . . . Of course, one does not have to await the
consummation of threatened injury to obtain preventative relief.
. . . The question becomes whether any perceived threat to
respondents is sufficiently real and immediate to show an
existing controversy.").  The harm suffered by NECTA members by
not having the option of electing whether to comply with
franchising and other regulations, while AT&T has that choice, is

For these reasons, OCC/NECTA Count 2 is ripe for judicial review.

## III. Count 3

Defendants also challenge on standing and ripeness grounds Count 3 of each Complaint, which counts claim discrimination in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  Count 3 in the OCC/NECTA Complaint alleges that "[the] DPUC's failure to require AT&T to obtain a franchise and comply with applicable regulations and law . . . is discriminatory.  The Defendant DPUC applies little, if any regulation with respect to AT&T's provision of cable service, while at the same time Defendant DPUC continues to impose more onerous regulation of existing cable operators that are members of NECTA.  Defendant DPUC's distinction between AT&T and other cable operators is not tailored to any legitimate justification." OCC/NECTA Compl. ¶¶ 78-79.  Similarly, Cablevision's Complaint claims that the DPUC's decision "is discriminatory in that it exempts from regulation one provider of video programming service

real, as opposed to the hypothetical and unidentifiable harm claimed in <u>Texas Cable & Telecommunications Association v. Hudson</u>, 458 F. Supp. 2d 309, 314 (W.D. Tex. 2006), cited by AT&T, where plaintiffs admitted that it was "too soon to tell what economic impact the [challenged state legislation] will have and to what extent there is disparate treatment of incumbent cable providers."  Here, setting aside the issue of whether there is a legitimate basis for any disparity in treatment, that plaintiffs are being treated differently than AT&T is undisputed and the harm to plaintiffs of having to comply with the franchising and other regulations whereas AT&T is not so obligated is obvious.

using public rights-of-way to deliver that service and continues existing and onerous regulation on Cablevision.  These distinctions are not tailored to any legitimate justification." Cablevision Compl. ¶ 43.  The OCC/NECTA Complaint also alleges that "[c]able operators, including NECTA's members, are speakers protected under the First Amendment of the United States Constitution" and references the First Amendment in its claim of unconstitutional discrimination.  OCC/NECTA Compl. ¶¶ 80-81.

Both defendants focus on OCC/NECTA's reference to the First Amendment, interpreting the claim as one alleging injury to plaintiffs' First Amendment right as speakers, contending, inter alia, "[t]he Complaint does not demonstrate how [the] DPUC's Decision favors IPTV provider [AT&T] over the franchised cable operators that burdens NECTA's free speech rights. . . . NECTA members continue to have a voice in the market of ideas, albeit that market may be more condensed by the potential entrance of [AT&T] as an IPTV provider," DPUC OCC/NECTA Mem. at 27-28, and arguing that "[t]o the extent that NECTA contends that the DPUC's Decision improperly subjects it to unfair competition from AT&T, NECTA fails to allege an injury cognizable under the Constitution.  The type of 'economic loss' alleged in the NECTA Complaint simply does not constitute a first amendment injury," AT&T Mem. at 12.  Accordingly, AT&T also argues that "it would be fundamentally contrary to the law of free speech to impose a

burden on AT&T in order to redress the discriminatory treatment allegedly suffered by the plaintiffs." Id. at 13-14 (citing cases). However, as OCC/NECTA claim, these arguments "stem from a mistaken assumption" because, as OCC/NECTA clarify in opposition, "Count III does not purport to state a claim under the First Amendment," but rather claims that NECTA's members are First Amendment speakers "because, as discussed below, this implicates the level of scrutiny applicable to the Equal Protection claim." OCC/NECTA Opp. at 23-24. While the applicable standard (whether strict scrutiny or rational basis) will be discussed below, this clarification eclipses defendants' First-Amendment-claim-specific arguments.[7]

Defendants also argue, for reasons similar to those advanced with respect to Counts 1 and 2, that plaintiffs do not have

---

[7] Moreover, with respect to AT&T's redressability argument, imposition of franchising and other regulatory requirements on AT&T is not analogous to the remedy sought in Henderson v. Stalder, 287 F.3d 374, 387 (5th Cir. 2002), cited by AT&T, where the Fifth Circuit dismissed for lack of standing a constitutional challenge alleging that Louisiana had discriminated in favor of one group of speakers, finding that "even if the [challenged] Choose Life statute [authorizing a state license plate bearing the message 'Choose Life'] is declared unconstitutional, [plaintiff's] complained of injury would not be redressed as that remedy will not provide [her] a forum in which to express her pro-choice viewpoint. Instead, the requested relief would merely function to prevent other motor vehicle drivers from expressing their choose-life point of view." Here, plaintiffs do not seek to enjoin AT&T from exercising its First Amendment rights, but rather they seek equal application of cable franchising obligations, which have recently been upheld in the face of a First Amendment challenge. See Pacific Bell Tel. Co. v. City of Walnut Creek, 428 F. Supp. 2d 1037, 1052 (N.D. Cal. 2006).

standing to bring Count 3 because they have alleged no injury in fact.  However, as set out above, the injury in fact successfully alleged by plaintiffs is in the form of unfair competition resulting from the allegedly unlawful exemption of AT&T from the franchising and related regulations.  See New England Public Commc'ns Council, supra (acknowledging "that parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition"); cf. also Ne. Fla. Chapter of Assoc. Gen. Contractors of America v. City of Jacksonville, 508 U.S. 656, 666 (1993) ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit. . . . To establish standing, therefore, a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis.").[8]

---

[8] Defendant DPUC's attempt to distinguish Northeastern Florida on the basis that its decision "in no shape or form prohibits CATV companies from offering IPTV and to obtain the same regulatory treatment as [AT&T]," DPUC OCC/NECTA Reply [Doc. # 62] at 8-9, assumes a conclusion in its favor on the merits of plaintiffs' claims – if AT&T's IPTV/video programming service is found to constitute, as plaintiffs allege, a "cable service," then the barrier erected in the form of regulations applicable to plaintiffs' programming but not to AT&T's constitutes an injury in fact under the rationale of Northeastern Florida.
    Additionally, AMSAT Cable Ltd. v. Cablevision of Conn. Ltd.

The DPUC's ripeness argument appears to be a merits argument, contending "Count III of the Complaint does not reveal how the DPUC's Decision favors IPTV provider [AT&T] over franchised companies in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  IPTV is not a cable service and [AT&T] is not a cable company."  DPUC Cablevision Mem. at 27.  Whether AT&T's video programming service constitutes a cable service being offered by a cable operator is the issue to be determined by this Court in adjudicating the pending Motions for Summary Judgment, and whether or not this claim is ripe does not depend on the outcome of that adjudication.  DPUC's contention that what impact AT&T's entrance

_____

P'Ship, 6 F.3d 867 (2d Cir. 1993), cited by the DPUC, is distinguishable because the harm claimed there – that a Connecticut mandatory cable access law unconstitutionally favored franchised cable operators by guaranteeing them access to the homes of viewers who wanted their services, while not guaranteeing such access to plaintiff AMSAT – was speculative because the "effect of [the statute] on AMSAT's ability to gain access to . . . apartment complexes" was "unknown" and AMSAT's claim was "based on the presupposition that it [would] not be able to obtain access to additional buildings it wishe[d] to service because it ha[d] not received the right of access accorded franchised cable operators," but "there [wa]s no admissible evidence in the record tending to prove that AMSAT ha[d] been denied access to any buildings it sought to service" and "AMSAT ha[d] not affirmatively stated that it [would] seek to provide service in the future to any complex that [wa]s or could be serviced by franchised cable."  6 F.3d at872-73.  Here, by contrast, the harm claimed by plaintiffs is not unknown or speculative; rather, it is the tangible and actual harm of being subjected to franchising and other regulatory obligations to which AT&T is not subject but which obligations plaintiffs allege are equally applicable to AT&T's video programming service.

into this market will have on plaintiffs is "premature to judge,"
is similar to AT&T's argument with respect to OCC/NECTA Count 2,
which argument was rejected. <u>See</u> Pt. II. B., <u>supra</u>.

With respect to defendants' Rule 12(b)(6) argument
contending that rational basis, not strict scrutiny, is
applicable to Count 3, and that the DPUC's decision passes
rational basis review, the Court need not determine which
standard is applicable to Count 3 because even conducting the
more deferential rational basis analysis, which requires that a
classification be "upheld against equal protection challenge if
there is any reasonably conceivable state of facts that could
provide a rational basis for the classification," <u>See</u> <u>Fed.</u>
<u>Commc'ns Comm'n. v. Beach Commc'ns, Inc.</u>, 508 U.S. 307, 313
(1993), defendants' Rule 12(b)(6) argument fails.  Although AT&T
argues that "[t]o state a claim, Cablevision and NECTA must
establish that the DPUC had no plausible reason for rejecting
plaintiffs' request to rewrite the Cable Act and to extend its
franchising requirement to video programming that does not fall
within the statutory definition of a 'cable service,'" AT&T's
argument is circular – plaintiffs do not argue that the DPUC
should have "rewritten" the Cable Act to include within its scope
AT&T's service, but rather they contend that the DPUC's decision
finding that service did not fall within the statutory definition
of "cable service" had no rational basis.  Indeed, plaintiffs

claim that Congress has stated that AT&T's video programming service falls within the existing definition of a "cable service" being offered by a "cable operator."  See OCC/NECTA Opp. at 28-29 (citing Congressional reports and other statements).  The Court cannot, on this undeveloped record, determine that plaintiffs will be unable to prove that the DPUC's decision lacked even a rational basis, and thus defendants' arguments for dismissal of Count 3 on Rule 12(b)(6) grounds must also be rejected.

## IV.  OCC/NECTA Count 4

AT&T seeks dismissal of OCC/NECTA Count 4 for a declaratory judgment concerning the status of other video programming services being offered by NECTA members, contending that the claim is not ripe and, moreover, that the Court should abstain from deciding it pursuant to the doctrine of primary jurisdiction.  The gist of AT&T's arguments is that the issue of whether certain services being offered by NECTA members constitute "cable services" under the Cable Act has not yet been determined by the DPUC in the first instance and that the Court's adjudication of this count would thus be nothing more than an advisory opinion about the application of the Cable Act and related state regulatory authority.

AT&T argues first that the claim is not ripe as "NECTA does not allege that its members have ever attempted to offer some video programming service in the absence of a cable franchise.

Nor does NECTA contend that the DPUC has either brought or threatened to bring an enforcement action challenging the manner in which some NECTA member offers video service.  In fact, NECTA nowhere contends that it 'has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.' . . . NECTA seeks nothing more than an abstract declaration of legal rights completely divorced from any concrete dispute.  The federal courts have no authority to issue such an advisory opinion."  AT&T Mem. at 19.

As noted above, "[t]o be justiciable, [NECTA's] claim[] must be ripe for federal review. . . The ripeness doctrine protects the government from 'judicial interference until a . . . decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  Thomas, 143 F.3d at 34 (quoting Abbott Labs., 387 U.S. at 148-49).  "The ripeness doctrine prevents the courts, 'through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also [protects] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  Motor Vehicles Mfrs. Ass'n, 79 F.3d at 1305 (citing Abbott Labs., 387 U.S. at 148-49).

Here, OCC/NECTA's Count 4 alleges, inter alia, that "[c]urrent cable operators, including members of NECTA, provide

their video programming service to subscribers using networks
that involve internal interaction between the terminal equipment
located at the customers' premises and the equipment located at
the provider's premises to monitor and manage the provision of
the service," as AT&T will provide its video programming service.
OCC/NECTA Compl. ¶¶ 83-87.  Count 4 accordingly seeks "[i]n the
alternative, to the extent that the Court holds that the use of
interaction between the equipment at the subscriber's premises
and the equipment and the provider's location in the provision of
video programming service exempts such provision of video
programming service from the requirement for a franchise under 47
U.S.C. § 541, then the Court should conclude and declare that the
holding should apply to all entities, including members of NECTA,
who provide video programming to subscribers via networks that
employ internal interaction to monitor and manage the provision
of the service."  Id. ¶ 88.  Count 4 claims that absent this
declaration, "members of NECTA will be subject to laws and
regulations under federal, as well as Connecticut, law concerning
the provision of their video service in Connecticut to which AT&T
in its provision of Video Service in Connecticut will not be
subject or otherwise will be deemed exempt and, therefore, the
interests of consumers represented by the OCC and the legal
rights of members of NECTA with operations in Connecticut will be
harmed."  Id. ¶ 89.  The Count does not allege that the DPUC has

either specifically required compliance with franchising requirements for provision of this form of video service, nor does it allege that NECTA members have been threatened with compliance action for offering such service without a franchise.

As discussed above, the applicability of the ripeness doctrine "depends on two factors: the fitness of the issues for adjudication and the hardship to the parties that would result from withholding review." Motor Vehicles Mfrs. Ass'n, 79 F.3d at 1305. Here, there is no issue fit for adjudication because no DPUC decision has yet been made that NECTA members cannot offer this service without complying with franchising requirements. Moreover, hardship will not result to the parties if review is withheld because NECTA members can raise this issue with the DPUC in the first instance, and any DPUC determination on the issue will be informed by this Court's determination of the issues relating to AT&T's video service raised by the earlier counts in the plaintiffs' Complaints. As noted above, the ripeness doctrine is intended to prevent the courts from "entangling themselves" in "abstract disagreements over administrative policies" which may never be realized and "also protects the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way." Id. Here, there has been no request to the DPUC for an exemption from the franchising requirements, nor has the DPUC

indicated that such request would be denied or that it will pursue prosecution against any NECTA member who offers this type of video service without a franchise.

Thus, although NECTA is correct that as a general matter "a litigant need not expose himself to criminal prosecution to challenge the constitutionality of a statute providing criminal penalties," Gary D. Peake Excavating Inc., 93 F.3d at 72, NECTA may pursue this issue directly with the DPUC and it is not entitled to an advisory opinion concerning the propriety of any hypothetical DPUC determination. See also Public Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 247 (1952) ("Anticipatory judgment by a federal court to frustrate action by a state agency is [not] tolerable to our federalism.").

Accordingly, OCC/NECTA Count 4 seeking an alternative declaration concerning the regulatory status of a video service being offered by some NECTA members is not ripe for judicial review, and therefore must be dismissed.

## V.    Cablevision Count 4

Defendants also seek dismissal of Cablevision's Count 4 claiming violation of 42 U.S.C. § 1983, arguing that the DPUC does not constitute a "person" under Section 1983, and that the Eleventh Amendment bars this claim. Cablevision responds by contending that the Eleventh Amendment allows claims for prospective injunctive relief.

Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ."  But "neither a State nor its officials acting in their official capacities are 'persons' under § 1983."  Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989).  This limitation includes state agencies, such as defendant DPUC.  See Gaby v. Bd. of Trs. of Cmty. Technical Colls., 348 F.3d 62, 63 (2d Cir. 2003).

Further, the Eleventh Amendment of the United States Constitution renders "an unconsenting State [] immune from suits brought in federal courts by her own citizens as well as by citizens of another state" and "in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment. . . . This jurisdictional bar applies regardless of the nature of the relief sought."  Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100 (1984) (emphasis added).  Thus, although Cablevision contends that its claim under Section 1983 against the DPUC should be permitted as it seeks only prospective injunctive

29

relief, with reference to the Supreme Court's decision in Ex parte Young, 209 U.S. (1908), Young only permits claims for such relief advanced against state officials, but not against states themselves or their agencies.  See Santiago v. N.Y. State Dep't of Correctional Servs., 945 F.2d 25, 32 (2d Cir. 1991) (dismissing Section 1983 claim for injunctive relief against Department of Correctional Services for failure to "follow the requirement, established in Ex Parte Young, that a plaintiff seeking prospective relief from the state must name as a defendant a state official rather than the state or a state agency directly, even though in reality the suit is against the state and any funds required to be expended by an award of prospective relief will come from the state's treasury," describing this as the "Ex Parte Young 'fiction'").

Accordingly, the DPUC is not subject to suit under Section 1983, and Count 4 of the Cablevision Complaint must therefore be dismissed.

## VI.  Cablevision Request for Attorneys Fees

AT&T also seeks to strike Cablevision's request for attorneys fees, contending that such an award is foreclosed by the plain language of 47 U.S.C. § 555a(a), which provides:

> In any court proceeding pending on or initiated after October 5, 1992, involving any claim against a

> franchising authority or other governmental entity, or
> any official, member, employee, or agent of such
> authority or entity, arising from the regulation of
> cable service or from a decision of approval or
> disapproval with respect to a grant, renewal, transfer,
> or amendment of a franchise, any relief, to the extent
> such relief is required by any other provision of
> Federal, State, or local law, shall be limited to
> injunctive relief and declaratory relief.

Cablevision does not respond to AT&T's contention. As it limits relief to injunctive and declaratory forms only, Section 555a(a) does not provide for the award of attorneys fees that Cablevision seeks, <u>see</u> <u>also</u> <u>McClellan v. Cablevision of Conn., Inc.</u>, 149 F.3d 161, 168 & n.15 (2d Cir. 1998) (observing that Section 555a(a) limits the remedies available for claims brought against a municipality, through its local franchise authority, brought under 42 U.S.C. § 1983), and that prayer for relief must therefore be dismissed.

## VII. Conclusion

For the foregoing reasons, the pending Motions to Dismiss [DOCS. ## 37, 39, 42, 45] are GRANTED, with respect to OCC/NECTA Count 4, Cablevision Count 4, and Cablevision's request for attorneys fees, and DENIED, with respect to the balance of the remainder of the counts in plaintiffs' Complaints.

IT IS SO ORDERED.

                       /s/
_____
                       Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut, this 25th day of July, 2007.**