| | |
|---|---|
| Office of Consumer Counsel and | : |
| New England Cable and | : |
| Telecommunications Association, Inc., | : |
|     Plaintiffs, | : **LEAD** |
| | : **Case No. 3:06cv1106** |
| v. | : (JBA) |
| | : |
| Southern New England Telephone | : |
| Company d/b/a AT&T Connecticut, Inc. | : |
| and Department of Public Utility Control | : |
| of the State of Connecticut, | : |
|     Defendants. | : |

### RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
### [DOCS. ## 38, 44, 57, 58, 61]

Familiarity with the factual and procedural background of
this consolidated action, as described in the Court's Ruling on
Motions to Dismiss [Doc. # 77] is presumed. As detailed therein,
this action was originally initiated as two separate lawsuits,
the first brought by the Office of Consumer Counsel ("OCC") and
the New England Cable and Telecommunications Association, Inc.
("NECTA") against Southern New England Telephone Company, doing
business as AT&T Connecticut, Inc. ("AT&T") and the Department of
Public Utility Control of the State of Connecticut (the "DPUC")
(Case No. 06cv1106), and the second brought by Cablevision of
Connecticut, L.P., Cablevision of Southern Connecticut, L.P., and
Cablevision of Litchfield, Inc. (collectively, "Cablevision")
against the DPUC (Case No. 06cv1107), both concerning the issue
of whether a proposed new service offered by AT&T (now marketed

and provided by AT&T in Connecticut as "U-verse") falls within the definition of "cable service" under the Cable Communications Policy Act of 1984 ("Cable Act"), as amended, 47 U.S.C. § 521 et seq.,[1] thus subjecting AT&T to cable regulation in Connecticut, and challenging the DPUC's determination that AT&T's new service did not fall within the federal "cable service" definition.  See OCC/NECTA Compl., Case No. 06cv1106 [Doc. # 1]; Cablevision Compl., Case No. 06cv1107 [Doc. # 1].  The parties have filed cross-motions for summary judgment on Counts 1 and 2 of each Complaint, which concern the issue of whether defendant DPUC's determination concerning AT&T's service is preempted by federal law and whether, accordingly, AT&T's provision of that service in Connecticut should be regulated as is the "cable service" provided by members of plaintiff NECTA and by plaintiff Cablevision.

I.    **Summary of Opinion**

For the reasons detailed infra, the Court concludes that the new service being offered by AT&T, which was the subject of the DPUC's June 7, 2006 decision, constitutes a "cable service" being offered over a "cable system" by a "cable operator," as those terms are defined in the federal Cable Act.  Accordingly, the

---

[1] The Cable Act was enacted "to amend the [federal] Communications Act of 1934 to provide a national policy regarding cable television."  See H.R. Rep. No. 98-934 at 18, reprinted in 1984 U.S.C.C.A.N. 4655.  Accordingly, the Cable Act is codified as Title VI of the Communications Act.

Court holds that the DPUC's conclusions to the contrary, and its concomitant determination that AT&T need not comply with the franchising requirement in 47 U.S.C. § 541 and the regulations promulgated thereunder, are preempted by federal law.  Thus, plaintiffs' Motions [Docs. ## 38, 44] will be granted, and defendants' Motions [Docs. ## 57, 58, 61] will be denied.

## II.  Factual Background

The parties dispute whether the factual findings made by the DPUC are entitled to deference, and they also contest which the DPUC findings may properly be classified as "factual," as opposed to "legal," but the following facts concerning the nature of AT&T's new "U-verse" service and the DPUC's decision are undisputed, unless otherwise noted, and are sufficient for the Court's adjudication of the pending Motions.

Pursuant to the Cable Act, "cable operators" providing "cable service" over "cable networks" are subject to franchising and other regulatory requirements promulgated by state regulatory boards (here, defendant DPUC) pursuant to the Act.  Plaintiffs contend that AT&T's new video programming service, U-verse, constitutes a "cable service" being provided by a "cable operator" over a "cable network," and that thus the DPUC's determination that AT&T's service does not fall under the ambit of the regulatory requirements is preempted by the Cable Act and AT&T should in fact be subject to these requirements.

Prior to the filing of this action, AT&T announced "Project Lightspeed," a network upgrade project which would allow AT&T to provide video programming and other applications in Connecticut. On December 27, 2006, AT&T announced that it was beginning to offer its "U-verse" service in neighborhoods across Connecticut metropolitan areas (see Suppl. Mem. [Doc. # 75] and attachments thereto). AT&T will use its network to provide video programming service to subscribers at retail. AT&T's network uses Internet Protocol ("IP") packetization for its digital video signals transmitted over its network. Internet Protocol is a protocol, or electronic language, used to break up video programming into separate packets of data that are then sent to the destination, where they are reassembled by the equipment at the destination (here, the subscriber's set-top box). AT&T's service transmits to customers prescheduled video programming (e.g., ABC, CBS, ESPN, CNN, HBO) at the same time and on the same schedule as the programming is being transmitted from the programming provider. In addition, the service also makes available Video on Demand ("VOD") content, which is video programming that is stored on central computers/servers and which can be chosen using on-screen menus and viewed by subscribers at a selected time, rather than a prescheduled time; subscribers are charged for VOD programs on a pay-per-view basis.

When a subscriber wants to view prescheduled programming

4

(such as on ABC, CNN, _et cetera_), the subscriber uses his or her
remote control and set-top box to initiate a request to change
the video stream, and that request (_i.e._, channel change) will
send a signal from the remote control/set-top box upstream to the
"node," intermediate network office, or video hub office; in
response to the subscriber's "request," AT&T's network will then
transmit video programming to that subscriber.  Thus, when an
AT&T subscriber wishes to watch a particular program on a
particular channel, there will be a flow of information in both
directions, including the request sent upstream from the set-top
box to the network, IP packets carrying the requested video
information sent downstream from the network to the set-top box,
and IP packets carrying error correction and other information
concerning authentication (_i.e._, making sure the particular
subscriber is entitled to view the requested programming)
traveling in both directions.  When an AT&T subscriber wants to
switch to a different channel, he or she will push a button on
the remote control and, after the intermediate
communications/signaling described above, the video programming
received by the subscriber on his or her television monitor will
change.[2]  Thus, while communication/signaling takes place

---

[2] This is in contrast to traditional CATV (Cable Antenna
Television) programming where the video programming is
automatically sent to all subscribers' set-top boxes, and the
set-top boxes then decode the programming on the basis of the
particular selections of the subscriber (including whether the

upstream from the subscriber's set-top box to the network, the actual video programming runs in only one direction – downstream from the network to the customer premises; AT&T admits that no video programming is transmitted from the customer premises. Notwithstanding the internal signaling occurring between the subscriber's set-top box, triggered by a subscriber changing the channel or making a VOD selection on his or her remote, the result (the requested channel change/delivery of selected video programming) is the same as a subscriber to traditional CATV changing a channel on his or her remote – that is, the push of the button changes the video programming displayed on the screen.

AT&T's U-verse programming includes three primary packages of programming (named "U200," "U300," and "U400"). Each of these packages will offer different varieties of video programming and will carry different prices, but each provides a certain number of channels showing prescheduled programming. These channels include local broadcast networks (e.g., ABC, CBS, NBC), cable channels (e.g., ESPN, CNN), premium cable channels (e.g., HBO), and also the aforementioned VOD/pay-per-view services. With the exception of VOD/pay-per-view, the programming on U-verse is linear – it is prescheduled by the programming provider, transmitted to AT&T on a schedule set by the provider, and made

subscriber is authorized to view the selected
channel/programming).

available to all subscribers on the tier.  Every U-verse
subscriber that selects a particular programming package will
have the ability to request transmission of the same video
programming (i.e., channels, VOD) as every other U-verse
subscriber that subscribes to that same programming package.

The DPUC proceeding thus addressed the issue of whether
AT&T's video programming service constitutes a "cable service"
under the Act, which defines "cable service" as: "(A) the one-way
transmission to subscribers of (i) video programming, or (ii)
other programming service, and (B) subscriber interaction, if
any, which is required for the selection or use of such video
programming or other programming service."  47 U.S.C. § 522(6).
As the DPUC noted at the time, this issue appears to be one of
first impression among both courts and regulatory commissions.
See DPUC Decision [Doc. # 57, App. A] at 1; Ill. Bell Tel. Co. v.
Vill. of Itasca, Ill., 2007 WL 1560263, at *11 (N.D. Ill. May 25,
2007) (slip op.) (leaving the issue of whether "plaintiff's IP-
based services" were "outside the definition of 'cable services'
in the Cable Act" "to another day," citing Pacific Bell Tel. Co.
d/b/a AT&T Cal. v. City of Walnut Creek, 428 F. Supp. 2d 1037,
1045 (N.D. Cal. 2006), which also did not decide the issue but
held "[w]hether AT&T's video programming in fact is a two-way
interactive service is an evidentiary matter to be addressed in
future proceedings").  The DPUC ultimately concluded that "IPTV

service, as proposed by [AT&T], is fundamentally two-way in nature, and as such, does not meet the federal or state definition of 'cable service' despite the apparent similarity in images that may appear on end users' screens in IPTV and CATV households." DPUC Decision at 43.

Specifically, the DPUC observed that "[t]he FCC has considered the phrase 'one-way transmission to subscribers' to reflect the traditional view of cable primarily as a medium of mass communication, with the same package or packages of video programming transmitted from the cable operator and available to all subscribers." Id. at 39. The DPUC recognized that "modern CATV systems may offer some two-way video capabilities (e.g., VOD)," but stated that it "believe[d] that these capabilities are limited when compared to [AT&T's] IPTV network. That is, in the IP-based network, two-way capability and interaction is ever-present, always requiring a dynamic interaction between the customer and network. In the instant case, this two-way interaction is between each customer's set top box and [AT&T] servers." Id. The DPUC found that "[AT&T's] network is unique in comparison to cable operators such as it entails a switched, two-way client server IP-based architecture designed to send each subscriber only the programming the subscriber chooses to view and entails a high level of subscriber interaction so that the subscriber will be able to tailor and integrate several different

offerings over the network." Id. at 41. The DPUC described the
"constant communication between [AT&T] servers and consumers" on
which AT&T's IPTV service "will depend" for "processing
information and interacting through [subscribers'] set top
box[es] to ensure that they are authorized to receive the
programming," including servers acknowledging receipt of upstream
requests and sending of IP authorization keys back to set-top
boxes, set-top boxes utilizing the keys for security purposes so
that only a set-top box with the stored correct authorization
keys can decrypt and retrieve the secure IP-video stream stored
at the server, and error correction signaling so that subscribers
receive the programming they have requested. See id. at 43. The
DPUC found "it clear . . . that delivery of [AT&T's] video
product will require regular upstream and downstream
communication between the video subscriber and the IP-video
server, thus requiring a two-way capability not necessarily
required by CATV operators for the conventional distribution of
cable video programming." Id. at 40. "In essence," the DPUC
found, "[AT&T's] planned IPTV service is merely another form of
data byte stream transmitted like other data over the Internet,
and as such it is not subject to legacy franchising
requirements." Id. at 1. It is this conclusion that plaintiffs
challenge as preempted.

## III. Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Where, as here, the parties agree as to the material facts necessary for disposition of the matters at issue, summary judgment is appropriate. See Leebaert v. Harrington, 332 F.3d 134, 139 (2d Cir. 2003).

## IV. Discussion

### A.    Standards for Interpretation

The parties agree that the legal conclusions of the DPUC, a state agency, are to be reviewed de novo. See Mich. Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc., 323 F.3d 348, 354 (6th Cir. 2003); S. New England Tel. Co. v. Conn., Dep't of Pub. Util. Control, 285 F. Supp. 2d 252, 258 (D. Conn. 2003) ("Federal review of state commission decisions does not implicate the rationale of the Chevron doctrine, which accords deference to federal agencies in their areas of expertise. . . . As a result, the state commission's interpretation of federal law is reviewed de novo.") (internal citations omitted). The parties dispute, however, the degree of deference, if any, to be paid to the

DPUC's factual determinations, with defendants contending that
such findings are "reviewed under the deferential arbitrary and
capricious standard," see <u>S. New England Tel. Co.</u>, 285 F. Supp.
2d at 258, and with plaintiffs contending that all of the cases
cited by defendants involve administrative appeals of agency
decisions where there was a statutorily defined role for that
agency as fact-finder.  More importantly, however, plaintiffs
challenge the defendants' characterization of certain DPUC
conclusions as "factual findings," including, most importantly,
the DPUC's determination that AT&T's video programming service
involves a "two-way transmission."  The Court agrees that this
determination constitutes a legal conclusion, applying the legal
definition of "cable service" to the DPUC's factual description
of AT&T's video programming, and thus this conclusion is not
entitled to any deference.  Moreover, the Court need not
determine the appropriate amount of deference to accord to the
DPUC's purely factual findings, because the facts concerning the
nature of AT&T's service necessary to adjudication of the pending
motions are not disputed.

Moving thus to the standard for determining whether AT&T's
service constitutes "cable service" such that the DPUC's
determination in the negative is preempted by federal law, "[t]he
proper time-tested procedure is first to consult the statute and
be guided by its plain meaning, with resort to legislative

history only when the statute appears ambiguous."  United States
v. Or., 366 U.S. 643, 648 (1961); accord Mallard v. United States
Dist. Court for the S. Dist. of Iowa, 490 U.S. 296, 300 (1989)
("Interpretation of a statute must begin with the statute's
language."); Caminetti v. United States, 242 U.S. 470, 490 (1917)
("If the words are plain, they give meaning to the act, and it is
neither the duty nor the privilege of the courts to enter
speculative fields in search of a different meaning. . . . [W]hen
words are free from doubt they must be taken as the final
expression of the legislative intent, and are not to be added to
or subtracted from by considerations drawn . . . from any
extraneous source.").  "The plain meaning of legislation should
be conclusive, except in the rare cases [in which] the literal
application of a statute will produce a result demonstrably at
odds with the intentions of its drafters. . . . In such cases,
the intention of the drafters, rather than the strict language,
controls."  United States v. Ron Pair Enters., Inc., 489 U.S.
235, 242 (1989) (internal quotation omitted).

     B.   Statutory Definitions

     As noted above, the Cable Act defines "cable service" as
"(A) the one-way transmission to subscribers of (i) video
programming, or (ii) other programming service, and
(B) subscriber interaction, if any, which is required for the
selection or use of such video programming or other programming

service." 47 U.S.C. § 522(6). The words "or use" in part (B) were added by amendment in 1996. "Video programming" is defined as "programming provided by, or generally considered comparable to programming provided by, a television broadcast station," id. § 522(20), and "other programming service" "means information that a cable operator makes available to all subscribers generally," id. § 522(14). It does not appear to be disputed that AT&T is providing "video programming," the issue is whether the provision of that video programming constitutes "cable service."

### C.  Legislative History

The August 1, 1984 Cable Act House Report explains that "[c]able services consist of video programming, other programming services and subscriber interaction, if any, required to select programming.  The Committee intends to exempt video programming from common carrier regulation in accordance with the traditional conception that the one-way delivery of television programs, movies, sporting events and the like is not a common carrier activity."  H.R. Rep. No. 98-934 at 41.  The Report also observes that "th[e] distinction between cable services and other services offered over cable systems is based upon the nature of the service provided, not upon a technological evaluation of the two-way transmission capabilities of cable systems.  For instance, any service that allows customers to buy a product by sending a

signal over cable facilities, regardless of the precise mechanism to provide this signal, would not be a cable service." Id. at 43 (emphasis added).  But the report clarifies that "[s]ubscribers to video programming offered over cable systems have the capacity to select which programs they want to receive.  Sometimes – as in some ways of providing pay-per-view service – the selection involves sending a signal from the subscriber premises to the cable operator over the cable system.  Such interaction to select video programming is permitted in a cable service."  Id.

With respect to subscriber interaction, the Report states "[t]he Committee intends that the interaction permitted in a cable service shall be that required for the retrieval of information from among a specific number of options or categories delineated by the cable operator or the programming service provider.  Such options or categories must themselves be created by the cable operator or programming service provider and made generally available to all subscribers.  By contrast, interaction that would enable a particular subscriber to engage in the off-premises creation and retrieval of a category of information would not fall under the definition of cable service," explaining, "[t]his definition of interaction is necessary in order to ensure that providing subscribers with the capacity to retrieve information – capacity which may be part of a cable service – does not also provide subscribe[r]s with the capacity

to engage in off-premises data processing – an additional
capacity which may not be offered as part of a cable service."
Id.

The Report provides as examples of cable services: "video
programming, pay-per-view, voter preference polls in the context
of a video program, video rating services, teletext, one-way
transmission of any computer software (including, for example,
computer o[r] video games) and one-way videotex services such
a[s] news services, stock market information, and on-line airline
guides and category services that do not allow customer
purchases."  Id. at 44.  Examples of non-cable services include:
"shop-at-home and bank-at-home services, electronic mail, one-way
and two-way transmission of non-video data and information not
offered to all subscribers, data processing, video conferencing,
and all voice communications."  Id.

As noted above, in 1996 the definition of "cable service"
was amended to add the words "or use" to the subscriber
interaction element of the definition.  The House Conference
Report explained that the amendment was included to "reflect[]
the evolution of video programming toward interactive services."
H.R. Conf. Rep. No. 104-458 at 167, reprinted in 1996
U.S.C.C.A.N. 10, 1996 WL 46795.  More specifically, the Report
stated that the amendment was intended to reflect "the evolution
of cable to include interactive services such as game channels

15

and information services made available to subscribers by the cable operator, as well as enhanced services." Id. at 169.

D. "Cable Service"

The statutory language itself appears to require the conclusion that AT&T's video programming service does constitute a "cable service," as defined by the Cable Act. The Act requires "(A) the one-way transmission to subscribers of (i) video programming, or (ii) other programming service, and (B) subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service." Here, as discussed above, AT&T acknowledges that the flow of its video programming will be one-way, downstream, from the network to subscribers, and that video programming will not be transmitted upstream from the customer's premises. See OCC/NECTA L.R. 56(a)1 Stmt. [Doc. #38-3] ¶ 62, admitted in AT&T L.R. 56(a)2 Stmt. [Doc. # 61-1] ¶ 62; accord AT&T Inter. Resp. [Doc. # 38-4, Ex. 12] at NECTA-5.[3] The way AT&T's technology works, involving the two-way transmission of data/signals between the subscribers' set-top boxes and the network, is not excluded by the statutory definition referencing only "one-way

_____

[3] The recent industry publication attached to the DPUC's Reply Briefing, see [Docs. ## 72, 73, Attach.], which obviously constitutes no authority for judicial federal statutory interpretation purposes, does not suggest to the contrary, but instead focuses on the signaling which occurs between the set-top box and the network, which is discussed infra.

transmission to subscribers _of_ . . . _video programming_"
(emphasis added).

The Court observes that the legislative history of the Cable
Act is not inconsistent with this conclusion.  First, it is clear
from the 1984 House Report that Congress contemplated possible
transmission technology such as AT&T's which involves sending
signals back and forth, as well as true two-way transmission of
video or other content, such as "transmission of voice and data
traffic, and transactional services such as at-home shopping and
banking."  H.R. Rep. No. 98-934 at 27.  But Congress found that
the technology involved in, for example, pay-per-view services,
which is similar to the way in which AT&T's service works in that
"[t]he selection involves sending a signal from the subscribers
premises to the cable operator over the cable system," was
"permitted in a cable service."  _Id_. at 43.  The illustrations
provided in the House Report show that "one-way transmission to
subscribers of . . . video programming, or . . . other
programming service" refers to "the nature of the service
provided," _id_. at 43, _i.e._, video or other programming being
transmitted in only one direction, rather than to the nature of
the transmitting technology.  The examples of "non-cable
services" given in the Report ("shop-at-home and bank-at-home
services, electronic mail, one-way and two-way transmission of
non-video data and information not offered to all subscribers,

17

data processing, video-conference, and all voice communications," id. at 44) involve the back-and-forth of the actual programming (or other target service), rather than just the back-and-forth of signals necessary to obtain the programming.  By contrast, the examples given of "cable services" include programming that would be transmitted in only one direction but the selection and retrieval of which might involve upstream transmission of signaling or other data (e.g., pay-per-view, voter preference polls and video rating services, stock market information, id.); compare also AT&T Corp. v. City of Portland, 216 F.3d 871, 876-77 (9th Cir. 1999) (holding that plaintiff's cable broadband Internet access service did not constitute "cable service" as defined by the Cable Act, finding "Internet access is not one-way and general, but interactive and individual beyond the 'subscriber interaction' contemplated by the statute.  Accessing Web pages, navigating the Web's hypertext links, corresponding via e-mail, and participating in live chat groups involve two-way communication and information exchange unmatched by the act of electing to receive a one-way transmission of cable or pay-per-view television programming.") (emphasis added).

As to the subscriber interaction component of the "cable service" definition, the statute covers "subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service."  47 U.S.C. §

522(6)(B).  Because the plain meaning of the statutory language does not, on its own, suffice to resolve the parties' dispute concerning the scope of the term "subscriber interaction," the Court examines the 1984 House Report, which explained that subscriber interaction required for selection of "which programs they want to receive," including when such selection "involves sending a signal from the subscriber premises to the cable operator over the cable system," "is permitted in a cable service."  H.R. Rep. No. 98-934 at 43.  So long as "the interaction permitted in a cable service [is] that required for the retrieval of information from among a specific number of options or categories delineated by the cable operator or the programming service provider [and] made generally available to all subscribers," see id., the interaction does not exceed the scope of what is contemplated by the definition of "cable service."  The Report clarifies that "[t]his definition of interaction is necessary in order to ensure that providing subscribers with the capacity to retrieve information [which is made generally available to all subscribers] – capacity which may be part of a cable service – does not also provide subscribers with the capacity to engage in off-premises data processing – an additional capacity which may not be offered as part of a cable service."  Id.

As described above, the record shows that AT&T's U-verse

makes available sets of channels to all subscribers to a particular "tier" and that a U-verse subscriber will "interact" only as is required to turn the set-top box "on" and "off," change channels on the remote, and select pay-per-view/VOD programming.  Thus, although an AT&T subscriber's set-top box will be engaged in signaling back and forth with the network to retrieve content and engage in error correction, the subscriber him- or herself will do no more than turn the box "on" and "off" and select channels or pay-per-view/VOD programming, just as would a subscriber to traditional CATV.  This level of required subscriber interaction does not "enable a particular subscriber to engage in the off-premises creation and retrieval of a category of information."  Id.  There also is no evidence that AT&T's service provides subscribers any capacity to engage in any off-premises data processing/creation.  Accordingly, the subscriber interaction involved in AT&T's video programming service is the same as that involved in traditional CATV programming, and does not exceed the scope of that degree of interaction "required for the selection or use" of the programming, as contemplated by the Cable Act's definition of "cable service."

Defendants, relying on the so-called "Cable Modem Ruling," In re Inquiry Concerning High-Speed Access to Internet Over Cable and Other Facilities, 17 F.C.C.R. 4798 (F.C.C. 2002), in which

the FCC ruled that cable modem service does not constitute a
"cable service" under the Cable Act, argue that "[t]he phrase
'one-way transmission to subscribers' in the definition reflects
the traditional view of cable as primarily a medium of mass
communication, with the same package or packages of video
programming transmitted from the cable operator and available to
all subscribers," and contend that AT&T's service constitutes one
"offering a high degree of interactivity," taking it outside of
the "cable service" definition in the Cable Act.  See id. at
4833, 4835.  However, notwithstanding the differences in the way
the technology of U-verse works, including the request signal
sent from the subscriber's set-top box back to the network to
retrieve the selected programming, U-verse still falls within the
scope of "a medium of mass communication, with the same package
or packages of video programming transmitted from the cable
operator and available to all subscribers": the video programming
(both prescheduled broadcast programming and VOD) is generally
available to all subscribers within a particular tier, and the
fact that the programming is not transmitted to a particular
subscriber from the network until that subscriber tunes to that
channel or selects that particular VOD program does not change
this fact.[4]  This interactivity is not of the "high degree"

---

        [4] Defendants' argument that AT&T is not providing
programming at all, but is just providing "access" to programming
is contradicted by the record and AT&T's own admissions – it is

contemplated by the Cable Modem Ruling for exempting a service from the definition as it requires no more interactivity on the part of a subscriber than that involved in traditional CATV service.[5]  In fact, the level of interactivity required exactly fits into the FCC's own characterization of what Congress intended by its "cable service" definition: "[t]he legislative history states that Congress intended 'simple menu-selection' or searches of pre-sorted information from an index of keywords that would not activate a sorting program and 'would not produce a subset of data individually tailored to the subscriber's request' to be cable services."  Id. at 4385.[6]

---

not disputed that, following subscriber selection triggering a signal sent from the set-top box to AT&T's network, AT&T transmits programming for the subscriber to view.  Congress contemplated this selection/retrieval mechanism when discussing pay-per-view/VOD services, stating, "[s]ometimes – as in some ways of providing pay-per-view service – the selection involves sending a signal from the subscriber premises to the cable operator over the cable system.  Such interaction to select video programming is permitted in a cable service."  H.R. Rep. No. 98-934 at 43 (emphasis added).

[5] U-verse does not involve, taking the example cited by the FCC, "services . . . offering subscribers the capability for tailoring a video image to a subscriber's specific requests."  Id. at 4835-36.  All of the programming is made available to all subscribers on a particular tier, and all subscribers selecting a particular channel/VOD will receive identical programming, notwithstanding that it may be via separate packetized video streams.

[6] For this reason, AT&T's claim that plaintiffs' characterization of "cable service" would mean that streaming of Internet video would qualify as a "cable service" is not persuasive – streaming of Internet video does not involve packages of video programming, largely prescheduled by the

Defendants' other arguments supporting its interpretation of the "cable service" definition are not persuasive.  First, defendants argue that AT&T's service does not constitute "cable service" because, unlike traditional CATV, all programming is not delivered to all subscribers' set-top boxes all of the time, but rather only following upstream signaling from the subscriber's set-top box.  However, the Cable Act does not, by its terms, specify that to constitute a "cable service," all available programming must be delivered to all subscribers at all times.[7] Rather, as the legislative history indicates, programming simply must be made "generally available to all subscribers," and must be limited to "a specific number of options or categories delineated [and] created by the cable operator or programming service provider."  H.R. Rep. No. 98-934 at 43.  As discussed above, AT&T's service fits these requirements.

Defendants also argue, relying on the Cable Modem Ruling, that AT&T's service creates programming tailored to the individual subscriber and that it thus falls outside of the

---

programming provider and made available to all subscribers to that programming; for this reason, streaming of video from the Internet has the capability of "produc[ing] a subset of data individually tailored to the subscriber's request," which degree of subscriber interactivity – unlike that implicated by U-verse – appears to take it outside of plaintiffs' and the Court's interpretation of the "cable service" definition.

[7] Indeed, if the definition were interpreted in this way, pay-per-view programming would be excluded from "cable service."

"cable service" definition.  However, as described above,
notwithstanding that AT&T's technology requires individual
retrieval of video data streams by a subscriber's set-top box
from the network in order to view selected video programming, the
programming is not in fact "tailored" to individual subscribers.
Rather, AT&T's service consists of at least three different
programming packages (or "tiers"), each of which provides all
subscribers in that particular tier with identical programming.
Moreover, in keeping with the Cable Modem Ruling, AT&T remains
"in control of selecting and distributing content to subscribers"
and "the content [is] available to all subscribers generally,"
within the particular tier.  See Cable Modem Ruling at 4836.
This contrasts with the more individually tailored, by nature of
the two-way transmission of actual content involved, cable modem
service considered by the FCC in the Cable Modem Ruling, which
was found to be "a service built around Internet access, which,
among other things, allows subscribers to define searches for
information throughout the World Wide Web, query web sites for
information, engage in transactions, receive individually
tailored responses to their requests, generate their own
information, and exchange e-mail."  Id. at 4837.

Lastly, defendants argue that their service constitutes an
"information service," as defined in 47 U.S.C. § 153(20), and not
a "cable service."  Section 153(20) defines "[i]nformation

service" as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includ[ing] electronic publishing, but [] not includ[ing] any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service."  Defendants rely on the FCC's decision in <u>In re Petition for Declaratory Ruling that Pulver.com's Free World Dialup is Neither Telecommunications nor a Telecommunications Service</u>, 19 F.C.C.R. 3307 (F.C.C. 2004), in which the FCC determined that pulver.com's Free World Dialup ("FWD") was an unregulated information service. Defendants' contention that FWD and AT&T's video product are "indistinguishable" because both use telecommunications to transmit Internet Protocol packets between a server and a customer's premises, with the only differentiation occurring after these packets are reassembled into voice communication or video offering, is not persuasive.  The FCC determined that pulver.com's FWD fit the definition of "information service" because it "enables its members to 'acquire' information about other members' online presence at any particular time," it "'stores' both member information . . . and, if a member opts-in, voicemail messages on its server, that are accessible to other members," it 'provides members with certain information . . .

that they 'utilize' first to register for the FWD service and then to contact other members who are online," it "'processes' the [information an initiating member sends to the FWD server indicating it wishes to communicate with a recipient member] by determining both the recipient member's Internet addresses and online availability," and "makes available [that information] to that recipient member," and "[m]aking available the Internet addresses of the intended recipient member enables the initiating member to 'retrieve' this information;" lastly, "if a member's equipment generates a private Internet address that interferes with the ability of the user's CPE to determine public Internet addresses, FWD will 'transform' or repair the addressing information and will relay the 'signaling and media stream via a protocol conversion solution to facilitate delivery." 19 F.C.C.R. 3307 ¶ 11. Thus, in contrast to AT&T's video service, which provides packets of video programming content from AT&T's network to subscribers' set-top boxes, FWD only provides information to "facilitate[] peer-to-peer communication" over the Internet without any "geographic correlation to any particular underlying physical transmission facilities." Id. ¶¶ 4, 12. Further, while AT&T's service transmits video programming one-way (from private network to set-top box on subscribers' premises), FWD facilitates the two-way exchange of information/content/ideas/et cetera between peers over the public Internet. In short, FWD did not

fit the definition of telecommunications service of cable service, and U-verse does.[8]

### E.  "Cable Network"/"Cable Operator"

Having found that AT&T's video programming service constitutes a "cable service" under § 522(6), the Court must also consider whether such service is being provided by a "cable operator" over a "cable network" such that AT&T is subject to the franchising and other regulatory requirements which already apply to the plaintiff cable operators.  All parties appear to recognize that this determination largely hinges on the Court's interpretation of "cable service" and, given the Court's conclusion on that issue, only a few statutory interpretation issues remain.

The term "cable system" is defined as "a facility, consisting of a set of closed transmission paths and associated signal generation, reception, and control equipment that is

_____

[8] Moreover, the FCC specifically limited its holding regarding FWD and "information service" to "FWD" and "only to the extent it facilities free communications over the Internet between one on-line FWD member using a broadband connection and other on-line FWD members using a broadband connection," and "decline[d] to extend [its] classification holdings to the legal status of FWD to the extent it is involved in any way in communications that originate or terminate on the public switched telephone network, or that may be made via dial-up access."  19 F.C.C.R. 3307 ¶ 2 n.3.  This limitation counsels against applying the FCC's reasoning here, in a context even further removed from the FWD at issue in the decision, that is, the transmission of packetized video programming over a private network to subscribers.

designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community." Defendants appear to concede that if the Court determines, as it has, that AT&T's video programming service constitutes a "cable service," then its network constitutes a "cable system." However, the DPUC maintains the applicability of exception (C) to this definition, exempting "a facility of a common carrier which is subject, in whole or in part, to the provisions of subchapter II of this chapter," from the definition, "except that such facility shall be considered a cable system . . . to the extent such facility is used in the transmission of video programming directly to subscribers, unless the extent of such use is solely to provide interactive on-demand services." The DPUC's argument is contrary to the plain language of subsection (C), which provides that the definition does include facilities used in the transmission of video programming directly to subscribers, which AT&T's network admittedly is, "unless the extent of such use is solely to provide interactive on-demand services," which it clearly is not. "'Interactive on-demand services' means a service providing video programming to subscribers over switched networks on an on-demand, point-to-point basis, but does not include services providing video programming prescheduled by the programming provider." 47 U.S.C. § 522(12) (emphasis added). Here, it is not disputed that while

U-verse provides some pay-per-view/VOD services, it also provides channels containing video programming prescheduled by the programming provider (linear programming).

The term "cable operator" is defined as "any person or group of persons (A) who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system, or (B) who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system."  As the Court has determined that AT&T is providing a cable service over a cable system, and it does not appear to be disputed that it "directly or through one or more affiliates owns a significant interest in such cable system," the Court determines that, in the context of providing such cable service, AT&T is a "cable operator."

F.    Summary

Having found that AT&T constitutes a "cable operator" providing a "cable service" over a "cable system," as those terms are defined in the Cable Act, the Court finds that the DPUC's conclusions in its June 7, 2006 Decision to the contrary, and its related determination that AT&T need not comply with the franchising requirement in 47 U.S.C. § 541 and the regulations promulgated thereunder, are in conflict with and are thus preempted by federal law.

## V.   Conclusion

For the foregoing reasons, OCC/NECTA's Motion for Summary Judgment [Doc. # 38] and Cablevision's Motion for Summary Judgment [Doc. # 44] are GRANTED.   Defendants' Motions for Summary Judgment [Docs. ## 57, 58, 61] are DENIED.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut this 26th day of July, 2007.**